**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BRITTANY GUNN and CHRISTOPHER GUNN, INDIVIDUALLY AND A/N/F OF S.G., A MINOR** | § | |
| | § | |
| ***Plaintiffs,*** | § | **Civil Case No., ____________________** |
| **v.** | § | |
| | § | |
| | § | |
| **HUMBLE INDEPENDENT SCHOOL DISTRICT** | § | |
| | § | |
| ***Defendant.*** | § | |
| | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE COURT:

COMES NOW, Plaintiffs, Brittany Gunn and Christopher Gunn, individually and as next friend to their minor child, S.G. ("Plaintiff"), to file this *Plaintiffs' Original Complaint* against Defendant Humble Independent School District ("Defendant") as follows:

## A. NATURE OF SUIT

1. At all times relevant, S.G. was attending Defendant Humble Independent School District as a student at Bear Branch Elementary School. S.G. is a qualified individual with disabilities, including Other Health Impairment (Attention-Deficit/Hyperactivity Disorder) and Emotional Disturbance. Ms. Susan Sloan Simmons ("Ms. Simmons"), at all relevant times the principal of Bear Branch Elementary, was aware of S.G.'s disabilities and associated behavioral manifestations. Despite this knowledge, Ms. Simmons subjected S.G. to discrimination on the basis of his disabilities and retaliated against S.G. and his parents for engaging in protected advocacy during the 2023-2024 and 2024-2025 school years. This conduct denied S.G. equal access to educational services and benefits provided by Defendant, and included, but was not

limited to:

a. failing to implement and consistently apply appropriate supports and accommodations;

b. responding to disability-related behaviors with punitive disciplinary measures rather than supportive interventions;

c. failing to ensure S.G.'s physical and emotional safety, including failing to notify or follow up with Plaintiffs regarding incidents involving safety concerns;

d. utilizing physical force, including restraint, in response to behaviors known to be manifestations of S.G.'s disabilities.

## B. FACTUAL BACKGROUND

2. On August 9, 2022, S.G. began kindergarten at Bear Branch Elementary School in Defendant Humble Independent School District.

3. During his kindergarten year, S.G. experienced repeated illnesses requiring medication, including multiple courses of antibiotics. These medical conditions and associated side effects impacted S.G.'s behavior and regulation and contributed to the need for behavioral supports.

4. On December 2, 2022, a Response to Intervention ("RtI") plan, including a Behavior Intervention Plan ("BIP"), was collaboratively developed to provide accommodations and support for S.G.'s behavior. This plan was implemented on December 5, 2022.

5. On January 26, 2023, Plaintiffs requested a Full Individual Evaluation ("FIE") for special education services.

6. In February 2023, Defendant provided a Behavior Interventionist through its

Counseling and Behavioral Services department to support S.G. in the classroom. At that time, updates to S.G.'s RtI goals were also recommended.

7. In early March 2023, Defendant recommended a ten-day placement in the Elementary Behavior Support Program ("EBSP"), which required S.G. to attend an alternative campus approximately twenty minutes away from his home campus.

8. On March 8, 2023, Plaintiffs declined the EBSP placement due to concerns that the recommendation was premature and not appropriately tailored to S.G.'s individualized needs, including that:

a. S.G. was six years old and the off-campus placement was not developmentally appropriate;

b. the existing RtI plan had been in place for a limited duration;

c. updated behavioral goals had not been monitored for sufficient time;

d. newly implemented supports had not yet been given an opportunity to demonstrate effectiveness; and

e. S.G. was actively undergoing a special education evaluation and the EBSP program was for general education students.

9. On that same date, a Licensed Clinical Psychologist diagnosed S.G. with Attention-Deficit/Hyperactivity Disorder, Combined Type ("ADHD"). The evaluation identified functional impacts relevant to the school setting, including:

a. trouble resisting impulsivity and considering the consequences of his actions;

b. difficulty with transitions;

c. overreacting in situations he finds frustrating; and

d. difficulty evaluating the effect of his actions and behaviors on others and to match his behavior to the norms and expectations of various situations.

10. At that time, S.G.'s classroom environment included multiple students exhibiting disruptive behaviors, which contributed to his challenges. Observations from the Behavior Interventionist supported concerns that the classroom environment was not conducive to S.G.'s success.

11. On March 21, 2023, S.G. was placed in a different classroom. Following this change, S.G. demonstrated improved behavior, did not experience further illness-related disruptions, and received no additional office referrals. This improvement reflects that, when provided with appropriate supports and an appropriate learning environment, S.G. was able to successfully access and benefit from his educational program.

12. Prior to this classroom change, S.G. had received twenty-one office referrals. District records show these referrals were consistently documented and communicated to Plaintiffs at the time they were issued. Throughout this period, campus administration maintained timely communication, implemented supports, and engaged collaboratively with Plaintiffs to address S.G.'s needs. This collaborative and support-based approach stands in contrast to the practices that developed in the subsequent school year under Ms. Simmons' leadership.

13. In May 2023, S.G.'s initial ARD meeting was held, and he qualified for special education services under Other Health Impairment (ADHD) and Emotional Disturbance.

14. Plaintiffs disagreed with one of the criteria supporting the Emotional Disturbance eligibility, specifically the conclusion that S.G. demonstrated an inability to build and maintain relationships with peers and adults. At the suggestion of the campus principal, Plaintiffs requested an Independent Educational Evaluation ("IEE"). Plaintiffs also initiated the Section 504 process

and planned to provide both the FIE and IEE results to S.G.'s pediatrician to support informed medical decision-making.

15. At the conclusion of S.G.'s kindergarten year, S.G.'s mother met with the campus principal to discuss teacher placement for first grade and requested placement in a specific classroom with a teacher she believed would best support S.G.'s academic and behavioral needs. She also expressed concern regarding placement in a classroom with a paraprofessional providing in-class support, based on prior observations that such an environment contributed to increased behavioral challenges.

16. In response, the campus principal represented that adjustments had been made to draft classroom rosters to accommodate S.G.'s placement, including moving another student—with whom S.G. had documented difficulties and who was the grandchild of a campus employee––to a different classroom. However, when the school year began, that student remained in the requested classroom, and S.G. was placed elsewhere. Plaintiffs were not provided any explanation reconciling this discrepancy.

17. The campus principal retired at the conclusion of the 2022-2023 school year.

18. By the end of his kindergarten year, S.G. had demonstrated measurable progress when provided with appropriate interventions, accommodations, and a supportive classroom environment. During this period, campus staff maintained consistent communication with Plaintiffs and engaged in a collaborative approach to addressing S.G.'s needs. This established baseline demonstrates that S.G. was able to access and benefit from his educational program when appropriate supports were implemented, and that a cooperative relationship existed between Plaintiffs and campus administration prior to the transition in leadership.

19. At the start of the 2023-2024 school year, S.G. remained under active evaluation

for special education services, including consideration under Other Health Impairment (ADHD) and Emotional Disturbance. Defendant was aware of S.G.'s RtI plan, BIP, known behavior triggers, and need for support in the context of his disabilities.

20. S.G. was expected to begin the school year with continued implementation of his RtI supports and BIP; however, these supports were not implemented. In a subsequent investigation, Defendant asserted that RtI supports ceased "at the request of the parent." This assertion is not accurate. Plaintiffs did not request that RtI supports be discontinued. The failure to implement known and necessary supports at the start of the school year reflects a departure from prior practice and denied S.G. access to interventions necessary to support his disability-related needs.

21. Prior to the start of the school year, S.G.'s mother was informed that S.G. had not been placed in the classroom discussed with the prior principal and requested a meeting with Ms. Simmons, the newly assigned principal, and the returning assistant principal to address this discrepancy.

22. During that meeting, Ms. Simmons and the assistant principal stated that they were not aware of any prior classroom placement request but indicated they believed S.G.'s assigned classroom was an appropriate placement.

23. Subsequently, S.G.'s special education case manager informed S.G.'s mother that classroom placement discussions had, in fact, occurred, and that campus administration made the decision not to place S.G. in the requested classroom. The case manager further explained that the decision was based, at least in part, on S.G.'s status as a student under evaluation for special education services,

staffing considerations, and the belief that S.G. would receive in-class support in the assigned classroom alongside other students scheduled to receive such services.

24. These inconsistent explanations demonstrate that S.G.'s classroom placement was not the result of a transparent and individualized decision-making process. Instead, the placement was made, in whole or in part, based on generalized considerations, including disability-related status and staffing, rather than S.G.'s individualized needs. As a result, Plaintiffs were deprived of a meaningful opportunity to participate in the decision-making process, and S.G. was denied the benefit of an appropriate, individualized placement consistent with his known needs.

25. S.G. began his first-grade year on August 9, 2023. During the initial weeks of school, his classroom teacher reported that S.G. was building peer relationships, was responsive to redirection, and was not demonstrating aggressive behaviors or requiring formal behavioral supports. She also indicated that she did not agree with the prior conclusion that S.G. had difficulty building and maintaining relationships.

26. On August 29, 2023, S.G.'s teacher and the assistant principal contacted S.G.'s mother to report multiple instances of minor misbehavior. During this communication, S.G.'s behavior was characterized as intentional, with the teacher stating he was "manipulating the situation," reflecting a shift away from previously recognizing his behaviors as requiring support related to his disability.

27. When Plaintiffs raised concerns regarding the use of public correction, the teacher responded, "I'm not going to stop my lesson to pull him to the side," and the assistant principal added that classroom management decisions were with the teacher's discretion. These responses reflect a refusal to implement individualized behavioral

supports despite known needs.

28. Plaintiffs raised concerns regarding statements made to S.G. about his prior behavior and the removal of Positive Behavioral Interventions and Supports ("PBIS") rewards he had previously earned from other teachers. These actions represented a departure from previously implemented support-based strategies and contributed to S.G.'s distress and behavioral escalation.

29. Plaintiff specifically inquired whether S.G.'s RtI plan remained in place to provide support during the ongoing evaluation process. The assistant principal indicated she would look into the status of the plan; however, no follow-up was provided.

30. Shortly thereafter, Plaintiff received a phone call from S.G.'s teacher and Ms. Simmons reporting additional behavioral concerns. During this communication, the characterization of S.G.'s behavior escalated and was described in more severe and intentional terms than previously communicated by S.G. or other staff.

31. Plaintiff met with Ms. Simmons on September 5, 2023 to discuss her concerns, including the need for consistent implementation of supports given S.G.'s known disability-related needs. During this meeting, Ms. Simmons appeared supportive and in agreement with many of the concerns Plaintiff raised, including the assertion that all students deserve grace and a fresh start; however, Ms. Simmons' practices did not change, no RtI plan was implemented at that time, and behavioral concerns continued to escalate.

32. Plaintiffs later learned that S.G. had received multiple office referrals between September 11 and September 14, 2023 that were not communicated to them at the time they occurred. These referrals were not entered into the system until September 19, 2023—the same date the RtI plan was initiated. Because progress under the RtI framework

is measured, in part, by the number of office referrals, the delayed and consolidated entry of these referrals impacted the baseline data used to evaluate S.G.'s behavior and response to intervention.

33. These incidents were not communicated to Plaintiff as formal referrals and did not align with S.G.'s account of events. The delayed documentation and lack of timely disclosure prevented meaningful parental involvement and created a retrospective disciplinary record that did not reflect real-time communication or intervention, further undermining the consistent implementation of supports for S.G.'s disability-related needs.

34. On September 12, 2023, Ms. Simmons reported multiple incidents involving S.G. to Plaintiffs. However, she acknowledged that no effort had been made to identify patterns or behavioral triggers, despite Plaintiff's repeated communications identifying known triggers, including illness, peer conflict, competition, and embarrassment. This failure to assess known triggers reflects a departure from prior support-based practices and a failure to utilize available information necessary to address S.G.'s disability-related needs. Ms. Simmons stated that a meeting was necessary to develop an RtI plan due to S.G.'s "concerning behaviors." This marked a shift from prior communications, as the development of the plan was framed as a response to behavior rather than as a continuation of supports previously identified as necessary.

35. On September 15, 2023, Plaintiffs attended an RtI meeting intended to develop a plan to support S.G. However, campus staff presented Plaintiffs with a completed RtI plan, including an integrated BIP. The file name associated with this plan was September 12, indicating that the plan had been developed prior to the meeting and without meaningful parental input.

36. During this meeting, Plaintiffs raised concerns regarding interactions with a specific peer, which had been previously communicated to staff. Ms. Simmons responded that S.G. needed to "learn to deal with people like that in his life," and asserted that the incidents being discussed did not involve that student. Subsequent records revealed that the majority of the documented incidents did, in fact, involve that peer. This discrepancy reflects a failure to accurately assess contributing factors and undermined the development of appropriate, individualized interventions.

37. On September 19, 2023, Plaintiff requested assistance from the Assistant Superintendent of Elementary Schools after leaving the RtI meeting with concerns that their input was not being meaningfully considered. A meeting was scheduled for October 3, 2023. Following this request for additional support, the nature and severity of reported behavioral incidents involving S.G. began to escalate.

38. On September 26, 2023, Ms. Simmons reported an incident involving S.G. and his classroom teacher. S.G.'s account of the incident differed significantly from the description provided by Ms. Simmons. S.G. reported that the teacher physically pulled him by his shirt and blocked him in a doorway in an attempt to force him into another classroom. Plaintiff requested that Ms. Simmons obtain the perspective of another staff member present during the incident; however, no follow-up was provided.

39. A subsequent investigation claimed that the incident had been reviewed and the findings communicated to Plaintiffs. However, statements obtained during that investigation reflect that the identified witness was not asked about the incident at the time it occurred, and that Ms. Simmons did not obtain that perspective. This failure to conduct a complete and accurate investigation further contributed to unreliable reporting and resulted

in findings that did not fully reflect the available witness accounts. This investigation occurred after Plaintiffs filed a complaint regarding Ms. Simmons' discriminatory conduct and was consistent with the pattern of events that followed Plaintiffs' protected advocacy.

40. On October 3, 2023, Plaintiff met with the Assistant Superintendent and the Director of Elementary Education to address her concerns regarding inconsistent implementation of supports, breakdowns in communication, and lack of follow-up in situations involving S.G.'s safety. Plaintiffs were advised that these concerns would be addressed, but that "change doesn't happen overnight." Following this meeting, there was a temporary improvement in communication and documentation; however, these improvements were not sustained, and prior concerns reemerged in the following weeks.

41. On October 25, 2023, S.G. received an office referral for "kicking his teacher and a support teacher." The assistant principal informed Plaintiff that the support teacher, who was also S.G.'s special education case manager, reported that she witnessed the incident and that S.G. did not kick her or his teacher. The assistant principal further stated that Ms. Simmons reviewed the footage and determined that S.G. shuffled his foot toward the support teacher, but, while not forceful, his foot positioning toward his teacher was "clearly a kick." As a result, S.G. was assigned in-school suspension. Despite this determination, the referral continued to state that S.G. kicked both staff members, resulting in a disciplinary record that did not accurately reflect the underlying events.

42. During a meeting regarding this incident, S.G. expressed distress and stated, "I hate Bear Branch. I don't want to be here anymore." In response, Ms. Simmons stated, "Well, we don't want you here either," and then attempted to clarify the statements after S.G. and Plaintiff reacted. This interaction contributed to S.G.'s emotional distress and

reflects a departure from the supportive and student-centered approach previously demonstrated by campus administration.

43. On that same date, October 25, 2023, the campus received notification that S.G.'s IEE had been completed. During the incident described above, S.G.'s special education case manager advocated on his behalf by stating that S.G. had not engaged in the alleged conduct.

44. On October 26, 2023, Plaintiffs received an invitation to S.G.'s Initial ARD meeting and, at that time, observed that a different case manager had been assigned. The prior case manager was not aware that she had been removed from her role. She had previously worked with S.G. throughout the evaluation process, developed a relationship with both S.G. and Plaintiff, and contributed to the development of his support plans, including his IEP and BIP. This reassignment occurred without prior notice or explanation to Plaintiffs and followed both the case manager's and Plaintiffs' advocacy regarding the incident, resulting in the removal of a staff member familiar with S.G.'s needs at a critical stage in the evaluation and planning process.

45. A subsequent investigation by the Ms. determined that interviewing the special education case manager was not necessary to reach a finding of retaliation, discrimination, or harassment, and further concluded that the employee was not a credible witness due to her being on assault leave and having a strained relationship with administration. These findings relied, in part, on Ms. Simmons' characterization of the incidents and resulted in a conclusion that there was no evidence to question her professional judgment, despite the absence of a complete factual inquiry.

46. Also on October 26, 2023, after being notified of another behavioral incident,

Plaintiff arrived at the campus and observed S.G. alone in a closed room without supervision. S.G. was seated on the tile floor of a small, unfurnished room and was drawing on himself and his shoes with a pencil. This placement occurred without prior communication to Plaintiffs and reflects the use of an isolated environment in response to S.G.'s behavior.

47. Plaintiff sought to take S.G. home due to his visible distress and assumed illness, but Ms. Simmons stated that S.G. would not be permitted to attend a campus event open to the public if he left early. S.G. remained visibly upset during this interaction. This response prioritized compliance with disciplinary expectations over addressing S.G.'s emotional state and disability-related needs.

48. During this interaction, Ms. Simmons engaged in physical contact with S.G., including holding him by the wrists as he attempted to pull away, and later continuing physical contact despite his visible discomfort. Ms. Simmons also utilized a timer and directed S.G. to "make a decision or I'll make it for you." At the time, S.G.'s evaluations identified the use of timed demands as a trigger that escalated his behavior. These actions occurred while S.G. was visibly distressed and in the context of his known disability-related needs, and further escalated the situation rather than providing appropriate de-escalation or support.

49. On November 27, 2023, Plaintiff was informed by S.G.'s classroom teacher and S.G. that a substitute teacher had been assigned to provide one-on-one support specifically for S.G. in the classroom through the end of the semester. The assigned support remained in close proximity to S.G. throughout the school day, including during transitions, and was positioned beside or directly next to him during classroom activities. Plaintiff had

not been notified of this decision in advance and requested clarification regarding the purpose of the support and whether it was being implemented specifically for S.G. Ms. Simmons responded that the additional support would be "beneficial to all students in the classroom," but did not acknowledge that the support was being implemented specifically for S.G. or explain how it aligned with his individualized needs. Prior to the start of the school year, Plaintiff had informed Ms. Simmons that, based on prior observations and experiences, the presence of in-class support personnel in close proximity had historically contributed to behavioral escalation for S.G., and similar escalation was observed after this support was implemented. The implementation of this support without prior communication, and without a clear connection to S.G.'s individualized plan, reflects a lack of transparency and failure to implement supports in a manner consistent with S.G.'s individualized needs and prior known triggers.

50. In response, Plaintiff requested a phone call with the Assistant Superintendent to discuss concerns regarding the implementation of one-on-one support, including that S.G.'s draft IEP and proposed goals did not indicate a need for such support. A meeting with the Assistant Superintendent, Ms. Simmons, and Plaintiff was scheduled.

51. During the period S.G. received in-class support, the substitute assigned to provide that support made statements to S.G. that caused significant anxiety, including telling him that the country was going to war and that children as young as eleven or twelve could become pregnant. These statements resulted in observable anxiety-related behaviors and confusion. These concerns were raised with Ms. Simmons and the Assistant Superintendent during the December 7 meeting.

52. On December 5, 2023, Plaintiffs requested a copy of S.G.'s referral history in

preparation for the meeting. At that time, Plaintiffs were aware of only three referrals but were provided with twelve. Of those twelve referrals, nine were entered more than two school days after the incidents occurred. This delayed documentation affected the accuracy and reliability of the behavioral data used to evaluate S.G.'s conduct and response to intervention.

53. During the December 7, 2023 meeting, Plaintiff raised concerns regarding S.G.'s interactions with his classroom teacher, inconsistent implementation of his RtI plan, and that S.G. did not feel safe in his classroom environment.

54. Prior to the meeting, Plaintiff requested Ms. Simmons obtain the perspective of the teacher who witnessed the incident that occurred on September 25, 2023 and Plaintiff formally notified the staff witness of her request. During the meeting, Ms. Simmons characterized Plaintiff's communication with the staff member as "unprofessional."

55. During the December 7, 2023 meeting, it was determined that S.G. would receive instruction in a second-grade classroom for certain subjects to support both academic needs and provide a reprieve from his current classroom environment. However, shortly before Christmas break, Ms. Simmons determined that a full classroom change would occur. Defendant later characterized these changes as behavior-driven and implemented only after other supports had been exhausted.

56. In January 2024, S.G. transitioned to a new classroom—the placement originally requested by Plaintiff. Following this transition, S.G.'s behavioral concerns decreased significantly, he demonstrated improved regulation, and he was able to function without escalation. His teacher implemented RtI supports consistently and indicated that S.G. responded appropriately to general classroom strategies without requiring the level of

intervention previously suggested.

57. On January 22, 2024, Plaintiff informed campus staff that S.G. had developed tachycardia and was under the care of a cardiologist, providing this information to ensure appropriate responses during periods of distress. Shortly after this disclosure, S.G. began receiving referrals again. Notably, these referrals were not initiated by his classroom teacher, where he had demonstrated improvement, but by other staff members.

58. In February 2024, the campus counselor requested consent for Wellness Counselor Support. Documents later obtained through a Texas Public Information Act ("TPIA") reflect that Ms. Simmons had identified similar supports as appropriate earlier in the school year but were not implemented at that time. The delayed introduction of these supports limited opportunities to address S.G.'s behavioral needs prior to escalation.

59. In April 2024, an incident occurred related to S.G.'s anxiety surrounding the solar eclipse. Despite prior communication regarding his anxiety, medical condition, and known triggers–including confinement, loss of control, and peer visibility–Ms. Simmons responded by physically blocking the classroom doorway to prevent S.G. from leaving. As S.G.'s distress escalated, Ms. Simmons continued to emphasize consequences, including restricting participation in eclipse-related activities, rather than implementing de-escalation strategies or providing support.

60. S.G.'s first grade year was characterized by delayed and undisclosed disciplinary documentation, inconsistent and, at times, contradictory reporting, failure to implement identified supports with consistency and fidelity, and escalation to punitive and exclusionary practices despite known disability-related triggers. These practices marked a departure from the collaborative, support-based approach utilized during the prior school

year.

61. S.G. began his second-grade year on August 7, 2024. At that time, S.G. had been evaluated twice, with both the FIE and IEE supporting eligibility under Emotional Disturbance and Other Health Impairment (ADHD), and had a clinical diagnosis of ADHD. Campus staff were aware of S.G.'s disability-related needs, prior interventions and behavioral triggers, as well as his developing anxiety and medical condition, including tachycardia. No major behavioral concerns were reported during the first two weeks of school.

62. On August 19, 2024, campus staff conducted a staff-only RtI meeting that Plaintiffs were not made aware of. Plaintiffs later learned through records obtained via a TPIA request that decisions were made at that time to implement a teacher-only behavioral tracking system and delay opportunities for positive reinforcement. These decisions were not disclosed to Plaintiffs when the updated BIP was later shared. At the time of the meeting, campus staff had access to S.G.'s prior RtI documentation and teacher-developed supports from the 2023-2024 school year, which included identified strategies and recommendations for addressing behavioral needs. Despite this, those previously identified supports were not implemented, and the approach adopted emphasized tracking and disciplinary response over the implementation of known, previously effective interventions.

63. Beginning August 20, 2024, teachers initiated real-time behavioral documentation in a visible manner, which caused immediate distress to S.G. Documentation reflects that S.G. became visibly upset when staff recorded behaviors in his presence. Despite this observable response, the practices continued.

64. On September 9, 2024, and September 11, 2024, S.G. was involved in

disputes with a peer and received multiple days of in-school suspension. The disputes arose following verbal comments made by the peer, including telling S.G. to "shut up" and "stay out of other people's conversations." Ms. Simmons informed Plaintiff that a stay-away agreement would be implemented between S.G. and the peer.

65. On September 12, 2024, Ms. Simmons informed Plaintiff that the peer's parent requested a bullying investigation. During that same communication, Plaintiff expressed a desire to revisit special education or Section 504 supports and requested that the campus diagnostician contact S.G.'s father. That outreach did not occur. Additionally, an office referral for an unrelated incident on September 9 was entered into the system after the peer's parent's request for a bullying investigation.

66. Records later revealed that Ms. Simmons provided the peer's parent with options including a stay-away agreement, a bullying investigation, or the filing of assault charges. Plaintiffs were not provided similar options in response to incidents involving S.G. and their concerns with his interactions with a specific peer during his first-grade year, and instead were told that S.G. needed to "learn to deal with people like that in his life," demonstrating disparate treatment between S.G. and similarly situated peers. There is no indication in the records obtained by Plaintiffs that a bullying investigation was initiated or completed, or that any findings were made regarding whether the peer's conduct constituted bullying.

67. On September 20, 2024, S.G. reported to Plaintiff that he had been slapped in the face and kicked in the chest by a peer and exhibited signs of injury, including breathing difficulty and a visible scratch on his chest. Plaintiffs were not notified at the time of the incident, and S.G. was not sent to the nurse. Although Ms. Simmons indicated the incident

would be reviewed, no follow-up communication was provided to Plaintiffs.

68. Documentation further reflects inconsistent responses to student safety incidents. In multiple instances, other students involved in physical interactions with S.G. were sent to the nurse for evaluation. In contrast, S.G. was not sent to the nurse following incidents in which he was struck by other students, including at least two occasions in which he was slapped, and Plaintiffs were not notified of those incidents. These inconsistencies reflect a failure to apply safety protocols uniformly and to ensure S.G.'s physical well-being, resulting in disparate treatment of S.G. compared to other students involved in similar safety incidents.

69. On September 23, 2024, a bullying investigation concluded with a finding that S.G. had not engaged in bullying. That same day, S.G. received an office referral for a recess incident that was not witnessed by a teacher and was assigned three days of in-school suspension. Plaintiffs requested a copy of the referral, which described conduct as S.G. had "repeatedly punched" and "tackled" another student; however, internal documentation, and S.G.'s own statement, reflected that S.G. was grabbed first, responded with a single hit, and was subsequently tackled by another student.

70. During a September 26, 2024 RtI meeting, Plaintiffs raised concerns regarding the accuracy of the referral and whether all students involved had been interviewed. Staff acknowledged that not all students involved in the incident had been interviewed prior to the disciplinary decision. Despite these discrepancies, the referral was not revised, and students involved were not questioned until after S.G. completed his three days of in-school suspension.

71. During that same meeting, placement in the EBSP was proposed based on

"unsafe behaviors." At that time, S.G.'s RtI plan had not been fully implemented, small group counseling supports were not yet in place, and teachers indicated they were still getting to know S.G. in the classroom setting. Plaintiff declined the EBSP referral. The district later characterized this as a refusal of supports; however, Plaintiff objected specifically to removal-based intervention and requested that supports be implemented within the campus setting. Ms. Simmons' documentation from this meeting reflects a plan of "3-4 weeks EBSP," indicating a predetermined trajectory toward alternative placement prior to consistent implementation of supports.

72. Following the September 26 RtI meeting, S.G. began receiving additional referrals for minor instances of physical contact. S.G.'s teacher reported being instructed to document and refer S.G. to the office for any instance of hands-on contact. At the same time, previously identified supports—including peer mentorship, adult mentorship, and wellness counselor support—were removed from S.G.'s RtI plan and the punitive consequence of detention was added. These changes reflect a shift away from previously identified supportive interventions and toward a disciplinary approach to behavior known to be disability-related.

73. On October 1, 2024, a "power card" intervention began. Plaintiff requested clarification regarding how S.G.'s RtI goals would be implemented, campus staff indicated that behaviors involving physical or verbal conflict would be addressed through office referrals, resulting in a removal from the classroom environment. During these removals, S.G. was not permitted to earn positive reinforcement points, limiting the effectiveness of the intervention.

74. Within the RtI framework, behavioral progress was measured using both the

number of office referrals and the number of positive reinforcement points earned. Because referrals resulted in removal from the classroom and prevented S.G. from earning points, this structure directly influenced the data used to evaluate his progress.

75. Documentation dated October 3, 2024 reflects that Ms. Simmons and the assistant principal noted that S.G.'s behavior was "impeding the learning of himself and others" and that his needs exceeded what could be managed by a single teacher. In subsequent investigations, Ms. Simmons acknowledged that S.G. had been evaluated twice and that "it was apparent he had regulation issues." These statements reflect awareness of S.G.'s disability-related needs, that his behaviors required appropriate supports and interventions, and that Defendant was aware that S.G.'s behaviors were related to his disabilities yet failed to implement appropriate supports.

76. Despite this awareness, Defendant reduced or eliminated supportive interventions following Plaintiffs' protected advocacy on September 26, 2024, when consent for EBSP placement was declined. Specifically, Defendant removed wellness counselor support, peer mentorship, adult mentorship, and replaced those supports with increased reliance on disciplinary consequences, office referrals, and classroom removals.

77. From October 1 through October 22, 2024, S.G. demonstrated behavioral improvement and received no office referrals, evidencing his ability to respond positively to appropriate conditions and supports. Despite this progress, Defendant continued to escalate disciplinary measures rather than adjust interventions in response to demonstrated improvement.

78. On October 23, 2024, the assistant principal informed Plaintiff that S.G. was in the office following a recess incident and had run from staff when asked to report to the

office. She also referenced an earlier incident where S.G. was in the office but stated she had not been on campus and could not provide details.

79. After school, S.G. reported that a substitute teacher physically grabbed him and demonstrated the interaction in a manner consistent with physical restraint. No documentation, parental notification, or incident report was provided. Plaintiff confirmed with S.G.'s teacher that a restraint had occurred.

80. On October 24, 2024, the assistant principal called to inform Plaintiff that S.G. was in the office again due to running from adults when asked to go to the office. Plaintiff expressed concerns regarding the restraint from the previous day, and how S.G.'s fear of being restrained again could be contributing to his behavioral escalation. The assistant principal denied knowledge of the restraint occurring, reminded Plaintiff she was not on campus that morning, and stated she would look into it. Subsequent records indicate that the assistant principal was, in fact, on campus that morning and returned S.G. to his classroom, and that Ms. Simmons was aware of the restraint and Plaintiffs' concerns at that time; however, no documentation or follow-up was provided.

81. Later findings stated staff did not provide documentation because they "did not view the interaction as a restraint," despite subsequent references to the need for the substitute teacher to attend CPI training in November, which is inconsistent with that characterization.

82. In the days that followed, additional incidents were reported involving behavioral escalation and running around the building. Plaintiff repeatedly expressed concern that S.G. was fearful of being restrained again, as he had never been restrained before, and was fearful of going to the office, but the assistant principal dismissed Plaintiff's

concern.

83. On October 29, 2024, Plaintiff was informed that S.G. was in the front office and had been restrained by Ms. Simmons because he hit her. Plaintiff arrived at the school and observed Ms. Simmons entering the office holding S.G. tightly by the wrist and attempting to place him in the small room. Plaintiff stated he could meet with them in the assistant principal's office. Ms. Simmons then justified her restraint, provided Plaintiff with a restraint form, and presented Plaintiff with consent paperwork to refer S.G. to the EBSP program due to his "unsafe behaviors." S.G. was assigned three days of in-school suspension. The timing of this referral, occurring approximately four weeks after the September 26, 2024 RtI meeting and following a series of escalating incidents, corresponds with Ms. Simmons' prior documentation reflecting a "3-4 week EBSP" plan. During this same interaction, campus staff contacted the Behavior Specialist for the EBSP, and during that communication, the Behavior Specialist referenced an observation of S.G. that had been conducted earlier that week, reflecting involvement by EBSP personnel prior to the referral.

84. Following this incident, S.G. exhibited significant emotional distress and expressed fear of returning to school, stating that Ms. Simmons is "mean" and "she hurts me."

85. On October 31, 2024, Plaintiffs requested video footage of the restraints that occurred on October 23 and October 29, and requested documentation of the October 23 restraint. Ms. Simmons attempted to delay review of the footage until November 12, during a transition meeting while S.G. was attending EBSP, because she felt it was "important for all those involved to speak to the incidents and their responses to the behavior." Ms. Simmons did not acknowledge the request for documentation of the October 23 restraint.

86. On November 6, 2024, Plaintiff denied consent for S.G. to attend EBSP. Plaintiffs did not feel comfortable providing consent to an off-campus program until they were given the opportunity to view video footage. After Plaintiffs declined consent, Ms. Simmons informed Plaintiffs that her restraint was not on camera. Ms. Simmons also informed Plaintiffs that she would be implementing a "mirrored version" of the EBSP program on the Bear Branch campus. This plan involved S.G. being isolated from peer interactions for a ten-day period in a small office space. When Plaintiffs expressed concern that this "mirrored version" resembled in-school suspension rather than an intervention, and felt retaliatory, Ms. Simmons responded that the decision was not "disciplinary."

87. On November 15, 2024, Plaintiff was contacted by the assistant principal and the Director of Early Learning and Strategic Innovation, informing her that Ms. Simmons was "off campus for a few days" and requested Plaintiff return their call to discuss the on-campus EBSP plan, stating they were "very interested in getting [S.G.] back to campus as quickly as possible."

88. Plaintiff returned the assistant principal's phone call and agreed to meet with them to discuss the plan, view the proposed space where S.G. would receive support, and view video footage.

89. On November 15, 2024, Plaintiffs reviewed video footage with the assistant principal. Footage from October 23, 2024 showed the substitute teacher's interaction with S.G., where the substitute teacher followed S.G. to the bathroom, blocked him in a corner, and S.G. slipped past her and ran to the counselor's office as the substitute teacher chased him. The counselor was not in her office, so S.G. returned to the same restroom near his classroom. The substitute teacher waited in the hallway for S.G. to exit the restroom the

second time. She then blocked him into a classroom doorway and when he tried to get past her, she physically restrained him by placing her right arm near his neck and down his torso and her left arm across his torso, appearing to lift him off the ground. S.G. attempted to get away by pulling at her arms, but was unsuccessful, and later reported to Plaintiff that the substitute teacher stated, "Don't fight it" when he was struggling to break free. His classroom teacher was visible on the footage watching the restraint occur.

90. The campus registrar approached and motioned for the substitute to release S.G. When she released him, the registrar motioned for S.G. to come with him, which S.G. typically would do because they had a positive relationship, but instead S.G. ran back toward the counselor's office.

91. Moments later, footage shows Ms. Simmons pulling S.G. down the hallway by his arm as he actively resists by pushing his feet into the floor and pulling away. Ms. Simmons is walking with the campus registrar, who is trained in CPI protocols, but at no point did Ms. Simmons request his help to ensure S.G.'s safety.

92. Footage from October 29, 2024, shows Ms. Simmons pulling S.G. down the hallway by his arm as he actively resisted by hitting, kicking, and attempting to pull away. At one point, S.G. crossed in front of Ms. Simmons, and she used her body to force him into the cinderblock wall, pressing his face sideways between the wall and her body. She then continues to transport him by the arm to the front office. These interactions were not fully reflected in the formal documentation provided at the time.

93. Another clip from October 29, 2024 in the front office shows Ms. Simmons placing S.G. in the small room, removing all furniture from the room, and repeatedly moving back and forth between the doorway and the adjacent walls. While viewing this

footage, the assistant principal suggested fast forwarding to the timestamp where the restraint occurred because it was a long clip. Plaintiffs agreed, trusting that they would not be missing any important footage. At no point in the video footage did S.G. leave the small room, but Ms. Simmons was seen entering the small room with S.G. twice. Plaintiffs later viewed additional portions of this footage during a subsequent investigation that had not been included in the original viewing, including segments reflecting the timing of a phone call notifying Plaintiff that a restraint had occurred. Because the restraint itself occurred off camera, Plaintiffs were informed of the reported time of the restraint; however, the video segments appear inconsistent with the sequence of events presented during the initial viewing, including the timing of Ms. Simmons' initial entry into the room and the phone call to Plaintiff.

94. During approximately three months of S.G.'s second-grade year, district-produced records and contemporaneous parent documentation reflect that S.G. spent over 100 hours in isolation in the front office and/or this small room, which is approximately 48 square feet in size with bare white walls. This time included repeated removals from instruction, during which he was not allowed to return to the classroom for the remainder of the school day, and extended periods of isolation. At times, S.G. was physically prevented from leaving due to campus staff blocking the doorway with their own bodies or with furniture. The small room was also used by the campus for in-school suspension, and S.G.'s repeated placement in the room under conditions that precluded return to instruction functioned as disciplinary removal from instruction regardless of how it was formally characterized or recorded. Despite repeated concerns raised by Plaintiffs regarding the frequency, duration, and nature of this placement, the use of the small room was never

meaningfully investigated, acknowledged, or addressed by Defendant.

### C. POST-INCIDENT EVENTS AND DISTRICT RESPONSE

95. After viewing video footage with the assistant principal, the Director of Early Learning met with Plaintiffs to discuss how they were feeling. Plaintiffs were understandably concerned with the footage they viewed and expressed their concerns with the way S.G. was physically handled by the substitute teacher and Ms. Simmons, including the fact they were never informed of these physical interactions previously. The Director of Early Learning offered Plaintiffs the opportunity to transfer S.G. to a different campus within the district.

96. On November 18, 2024, Plaintiffs sent an email to the Director of Early Learning, stating they believed that Ms. Simmons had been intensely focused on removing S.G. from his classroom and from the campus, rather than helping him succeed. Plaintiffs further expressed concerns that Ms. Simmons may continue her retaliatory behaviors even if they were to transfer S.G. to another campus. The Director of Early Learning responded, copying Ms. Simmons and the assistant principal on the email, and stated, "I understand your concerns regarding the issues you've raised, and I want to assure you that Humble ISD has a strict no retaliation policy. Any behavior that could be interpreted as retaliatory will be taken seriously and investigated thoroughly…" Plaintiffs are not aware of any investigation conducted in response to their retaliation complaint.

97. On November 20, 2024, additional footage of Ms. Simmons' hallway interactions with S.G. on October 29, 2024, were viewed. S.G. is running down the hallway wearing a football jersey and an undershirt. From another camera angle, S.G. reappears, but this time is only wearing his undershirt. S.G. attempts to run past Ms. Simmons and she

wraps her arms around him. S.G. lowers himself to the ground and Ms. Simmons pulls him up by both of his arms before pulling him down the hallway. When asked about the two minutes of missing footage where S.G. reappears no longer wearing his football jersey, Plaintiffs were told there were no cameras in the interior hallways.

98. Ms. Simmons minimized the level of force used during these incidents, describing her actions as minimal contact despite video evidence reflecting sustained physical control, forced positioning against a wall, and continued physical handling while S.G. resisted.

99. These actions occurred in the context of S.G.'s age, size, known disabilities, and the absence of an immediate safety threat. The interactions were not documented contemporaneously and were later minimized in investigative findings.

100. At this point, S.G.'s mental health had significantly deteriorated, and Plaintiffs requested that he be permitted to complete the school year through the district's virtual program while he engaged in therapy. Defendant granted this request.

101. Following these events, S.G. exhibited significant emotional distress and began receiving Trauma-Based Cognitive Behavioral Therapy. He continues to experience ongoing effects related to his experiences at Bear Branch Elementary, reflecting the severity of the emotional impact associated with these events.

102. S.G.'s account of the October 29, 2024 restraint reflects his perception of the incident and resulting fear:

> "I kept closing the door because I wanted her to leave me alone because she is mean. She would open the door and I would hit/push her out of the doorway and close it again. She said, 'If you don't stop, I am going to restrain you.' I asked her what that

meant, and she said, 'Oh, you'll see.' Then she did and she twisted my arms behind my back and pulled down hard. I yelled for her to stop and told her she was hurting me. I think she only did that to show me she could hurt me if she wanted to and that she is in charge."

103. Despite repeated requests through TPIA submissions and direct communication with district administration, documentation was withheld, delayed, or not produced, including materials directly related to the reported use of physical force.

104. Plaintiffs escalated their concerns to the Superintendent, including allegations that Ms. Simmons had engaged in discriminatory conduct, used excessive physical force, and expressed concerns regarding the safety of all students on campus. An investigation into these concerns was delayed for several weeks, and Plaintiffs were not provided with the findings until approximately ten months later.

105. Records later provided to Plaintiffs reflect that, when Plaintiffs' email to the Superintendent was forwarded to the District's legal department, material portions of the communication describing Plaintiffs' allegations were omitted from the forwarded version. The forwarded communication was subsequently included in materials provided to external agencies.

106. After concluding that their concerns were not being adequately addressed, Plaintiffs filed complaints with Child Protective Services ("CPS") and the Texas Education Agency ("TEA"). Records later provided to Plaintiffs show that within a short period of time after CPS contacted the Defendant's Legal Department, Plaintiffs received notice that their Level One grievance had been dismissed on procedural grounds, denying Plaintiffs an opportunity to meaningfully participate in the grievance process.

107. Records later provided to Plaintiffs indicate that the CPS investigator was not provided complete or accurate information, including relevant video footage necessary to evaluate the reported incidents, S.G.'s behavioral history, and information regarding the nature, purpose, and use of the small room. Those records further reflect that interviews with key individuals involved, including Ms. Simmons and the substitute teacher, did not occur until more than two months after the complaint was filed.

108. To the extent reflected in the records available to Plaintiffs, subsequent agency reviews, including those conducted by TEA and law enforcement, relied in part on information developed through the CPS investigation.

109. Defendant subsequently conducted a Human Resources investigation, limiting the scope of review to claims of discrimination, retaliation, and harassment. The resulting report, provided in October 2025, found no wrongdoing but contained inaccuracies, omissions, and mischaracterizations of events, failed to include key witness interviews, and did not address all allegations raised by Plaintiffs, including concerns regarding the use of physical force, whether Ms. Simmons' restraint on October 29, 2024, was retaliatory, or the extent of S.G.'s repeated isolation in the front office and small room, as reflected in district records.

110. When Plaintiffs sought accountability through law enforcement, they filed charges related to assault, official oppression, unlawful restraint, and injury to a child with Defendant's police department. Action on these reports was delayed for approximately two months, after which Plaintiffs were informed the matter had been referred to an external agency. When Plaintiffs followed up, that agency initially had no record of the referral.

111. Plaintiffs later pursued relief through Ms.'s grievance process following the

outcome of the Human Resources investigation. A Level One hearing was granted and conducted by Defendant's external counsel, who reviewed prior investigations and conducted an additional inquiry. However, the review relied on inaccurate or incomplete information and did not correct deficiencies in the underlying record. When Plaintiffs requested corrections to inaccuracies, they were informed that such corrections would not be made to the report itself, but could be included in the appendix. Subsequent appeal efforts were redirected in a manner that limited Plaintiffs' ability to obtain correction of the district-controlled record.

## D. HARM, DELIBERATE INDIFFERENCE, AND HOSTILE ENVIRONMENT

112. Defendant had actual knowledge of the harm to S.G., including repeated reports of fear, emotional distress, inappropriate use of physical force, and concerns regarding isolation and removal from instruction. Despite this knowledge and repeated notice, Defendant failed to take reasonable corrective action. This failure was reflected not only in continued conduct at the campus level, but also in the District's response to Plaintiffs' complaints, including reliance on incomplete investigations, failure to obtain or accurately incorporate key witness statements, and findings that did not align with the available evidence. This failure to act in the face of known risks constitutes deliberate indifference to S.G.'s federally protected rights.

113. The conduct described herein created a hostile and abusive educational environment for S.G. based on his disabilities. This environment was characterized by repeated isolation, excessive and escalating disciplinary actions, use of physical force, removal from instructional settings, and inconsistent and exaggerated behavioral reporting. These actions interfered with S.G.'s ability to access educational services, participate in

classroom activities, maintain a sense of safety within the school environment, and denied S.G. meaningful access to instructional time and educational benefit.

114. Defendant's conduct was not isolated but part of a pattern that intensified following Plaintiffs' advocacy for appropriate supports and accommodations. S.G. was subjected to increased discipline, removal from peers, and denial of access to interventions previously identified as necessary to address his disability-related needs.

115. As a result of Defendant's actions, S.G. suffered physical pain, emotional distress, anxiety, and loss of enjoyment of life. Plaintiffs also suffered damages as a result of Defendant's conduct, including emotional distress, disruption to family functioning, and loss of educational opportunity for S.G.

## E. PARTIES

116. Plaintiffs are individuals residing in Texas. S.G. is a minor, and this matter is being asserted by Plaintiffs, his parents, as S.G.'s next friends. Because of the privacy issues involved in this matter, S.G. is hereby exercising his right to proceed with this matter anonymously.

117. The need to protect the identity of S.G., a minor, shall not hinder the defense of this matter, as the relevant facts are well known to Defendant. When applying the balancing test to determine the need for protection of the minor versus any inconvenience to Defendant, the need to protect the minor outweighs any minimal burden to Defendant.

118. At such time as the Court establishes procedures designed to protect the privacy of Plaintiff, S.G.'s identity shall be disclosed.

119. Defendant, Humble Independent School District, is a public school district

operating as a political subdivision of the State of Texas.

**F. SERVICE**

120. Defendant is a school district located in Harris County, Texas, and may be served with process by serving the superintendent, Dr. Roger Brown, at 10203 Birchridge Drive, Humble, TX 77338.

**G. JURISDICTION AND VENUE**

121. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including 42 U.S.C. § 12101 et seq., 42 U.S.C. § 12131 et seq., and 29 U.S.C. § 794.

122. Venue is proper in the Houston Division of the Southern District of Texas because the events giving rise to these claims occurred in Harris County, Texas, and Defendant operates within this District.

**H. PLAINTIFFS' CAUSES OF ACTION**

123. Plaintiffs bring this action pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibit discrimination on the basis of disability by public entities and recipients of federal financial assistance. Defendant also failed to meet its affirmative obligation to provide reasonable accommodations for S.G.'s disabilities. These actions, taken together, reflect a pattern of conduct that denied S.G. meaningful access to educational benefits and services.

124. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

**COUNT I – DISCRIMINATION (ADA & SECTION 504)**

125. S.G. is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Defendant Humble Independent School District is a public entity subject to Title II of the ADA and receives federal financial assistance within the meaning of Section 504.

126. Defendant excluded S.G. from participation in, denied him the benefits of, and subjected him to discrimination in the District's programs, services, and activities, including, but not limited to:

a. repeated removal from the classroom and instructional setting;

b. excessive and escalating disciplinary actions for behavior related to his disabilities;

c. isolation from peers and placement in the front office and small room for extended periods;

d. use of physical force, including restraint, in response to disability-related behaviors; and

e. failure to provide equal access to educational supports and interventions provided to non-disabled students.

127. The discrimination described herein occurred by reason of S.G.'s disabilities and not for legitimate, non-discriminatory reasons. Defendant treated S.G.'s disability-related behaviors as disciplinary issues rather than manifestations requiring support and accommodation, and treated those behaviors more harshly than similar conduct by non-disabled students.

## COUNT II – FAILURE TO ACCOMMODATE (ADA & SECTION 504)

128. Defendant had actual knowledge of S.G.'s disabilities, behavioral triggers, and need for accommodations, including through evaluations, RtI plans, BIPs, and direct communication from Plaintiffs.

129. Despite this knowledge, Defendant failed to provide reasonable accommodations necessary to afford S.G. equal access to educational programs and services, including:

a. failing to implement and consistently apply RtI supports and BIPs;

b. removing previously identified supports, including counseling and mentorship;

c. failing to account for known behavioral triggers;

d. using disciplinary removal in place of behavioral intervention; and

e. failing to adjust interventions in response to demonstrated improvement.

130. As a direct result of Defendant's failure to accommodate, S.G. was denied meaningful access to education, subjected to unnecessary escalation, and suffered emotional and educational harm.

## COUNT III – RETALIATION (ADA & SECTION 504)

131. Plaintiffs engaged in protected activity by advocating for S.G.'s rights, requesting accommodations, disputing disciplinary actions, requesting investigations, and filing complaints with district administration, CPS, and TEA.

132. Following this protected activity, Defendant subjected S.G. to adverse actions, including:

a. increased disciplinary referrals and escalation of behavioral reporting;

b. removal of supports and replacement with punitive measures;

c. increased isolation and exclusion from classroom settings;

d. recommendation of alternative placement; and

e. use of physical force, including restraint.

133. There is a causal connection between Plaintiffs' protected activity and Defendant's adverse actions, as evidenced by the timing of events, internal documentation reflecting predetermined decisions regarding removal and placement, escalation of discipline, and the shift from supportive to punitive measures following Plaintiffs' advocacy.

**COUNT IV – INTENTIONAL DISCRIMINATION / DELIBERATE INDIFFERENCE**

134. Defendant had actual knowledge that its actions were causing harm to S.G., including repeated reports of fear, emotional distress, inappropriate use of force, and concerns regarding isolation and removal from instruction.

135. Despite this knowledge, Defendant failed to take reasonable steps to investigate, correct, or prevent further harm, relied on incomplete or inaccurate investigative records, failed to obtain or accurately incorporate key witness information, and instead continued the conduct described herein.

136. Defendant's actions constitute intentional discrimination carried out with deliberate indifference to S.G.'s federally protected rights, entitling Plaintiffs to compensatory damages.

## I. REQUEST FOR JURY

137. Plaintiffs hereby request that a jury be empaneled and that theforegoing causes of action and requests for relief be presented thereto.

## J. PRAYER FOR RELIEF

138. WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendant's be cited to appear and answer herein, and that upon final trial, Plaintiffs recover judgment against Defendant for:

a. Compensatory damages, including damages for physical pain, emotional distress, mental anguish, and loss of enjoyment of life suffered by S.G., as well as damages suffered by Plaintiffs;

b. Economic damages, including any out-of-pocket expenses and costs incurred as a result of Defendant's conduct;

c. Educational and equitable relief, including but not limited to compensatory education and services necessary to remedy the denial of meaningful access to educational services and the loss of educational opportunity;

d. Declaratory relief that Defendant's actions violated S.G.'s rights under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act;

e. Injunctive relief as necessary to prevent ongoing and future violations, including requiring Defendant to implement policies, training, and practices consistent with federal law;

f. Attorney's fees and costs pursuant to applicable law; and

g. Pre-judgment and post-judgment interest as allowed by law.

139. Plaintiffs further pray for such other and further relief to which they may be justly entitled.

Respectfully submitted,

HOWLAND SHAKE LAW, LLP
17304 Preston Road, Suite 800
Dallas, Texas 75252
Tel: 469-371-4282
Fax: 469-574-7660

___/s/George Shake___________________
George H. Shake
State Bar No. 24077524
Federal ID 3684307
george@howlandshakelaw.com
Attorney for Plaintiffs